DECISION AND JOURNAL ENTRY
Appellants Karen Reeves and Linwood "Terry" Carmichael have appealed from a judgment of the Summit County Common Pleas Court, Juvenile Division, that terminated their parental rights and awarded custody of their minor children to the Summit County Children Services Board (CSB). This Court affirms the judgment of the juvenile court.
 I.
On November 7, 1998, CSB moved the juvenile court for permanent custody of Jonathan Reeves, Kalli Reeves, Jordan Reeves, Jason Reeves, and Terry Carmichael. Ms. Reeves is the natural mother of all five of the children. Additionally, Ms. Reeves has an older child named Alicia who lives with her aunt. Mr. Carmichael is the natural father of the twins, Jordan and Jason, and the alleged father of Terry. Mr. Carmichael is also the father of two other children, Steven and Christina Carmichael. Robert Bender is the alleged father of Kalli, and Harold Alberry is the alleged father of Jonathan.
The permanent custody hearing in this matter began in February 1999 and ended in March 1999. As a result of the hearing, the juvenile court terminated Ms. Reeves, Mr. Carmichael and Mr. Alberry's parental rights, and CSB was granted permanent custody of Jonathan, Jason, Jordan and Terry. The juvenile court denied CSB's motion for permanent custody of Kalli based on: 1) CSB's failure to provide reasonable case planning and lack of diligent effort with respect to Mr. Bender, and 2) CSB's lack of investigation with respect to Kalli's Native American heritage. Ms. Reeves and Mr. Carmichael separately appealed from that order, and this Court consolidated their appeals. As they relate, their assignments of error will be addressed together.[1]
 II. A. Mr. Carmichael's First Assignment of Error The Juvenile Court erred in granting the Summit County Children Services Board's motion for permanent custody of Jordan Reeves, Jason Reeves and Terry Carmichael where such action was not in the best interest of the children and was against the manifest weight of the evidence.
 Mr. Carmichael's Second Assignment of Error He Juvenile [sic] Court's finding that the children are not closely bonded to [Mr. Carmichael] is against the manifest weight of the evidence.
 Mr. Carmichael's Third Assignment of Error The Juvenile Court's finding that the Children Services Board engaged in reasonable case planning and diligent efforts to assist [Mr. Carmichael] to remedy the problems that initially caused the children to be placed outside the home is against the manifest weight of the evidence and the Children Services Board failed to make any such efforts or engage in any such planning.
 Mr. Carmichael's Fourth Assignment of Error The Juvenile Courts [sic] finding that [Mr. Carmichael] has not substantially complied with the requirements of his case plan is against the manifest weight of the evidence.
 Mr. Carmichael's Fifth Assignment of Error The Juvenile Court's finding that [Mr. Carmichael] demonstrated a lack of commitment to the children by failing to regularly support, visit and/or communicate with the children or showed an unwillingness to provide an adequate permanent home for the children was against the manifest weight of the evidence.
 Ms. Reeves's Fifth Assignment of Error The Trial Court erred and abused its discretion when it awarded the Summit County Children Services Board permanent custody of Johnathan [sic] Reeves, Jordan Reeves, Jason Reeves and Terry Carmichael.
 Essentially, Ms. Reeves and Mr. Carmichael have both asserted that the juvenile court's judgment was against the manifest weight of the evidence. Their assertions are without merit.
Termination of parental rights is an alternative of last resort; however, it is sanctioned when necessary for the welfare of a child. In re Wise (1994), 96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award permanent custody of a child who is neither abandoned nor orphaned to a proper moving agency, it must find by clear and convincing evidence that: (1) the grant of permanent custody to the agency is in the best interest of the child; and (2) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. See In re William S. (1996),75 Ohio St.3d 95, 99; see also, R.C. 2151.414(B)(1).
 The standard of "clear and convincing evidence" requires more than a mere preponderance of the evidence, but it does not rise to the level of certainty that is required of the beyond a reasonable doubt standard in criminal cases. Rather, it must produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.
 Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof.
In re Murphy (April 9, 1997), Summit App. No. 17958, unreported at 3, quoting State v. Schiebel (1990), 55 Ohio St.3d 71,74.
When a juvenile court determines the best interest of a child, for purposes of ruling on a motion for permanent custody, it is required to consider all relevant evidence, including, but not limited to:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child; [and]
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
 R.C. 2151.414(D). When a juvenile court determines, for purposes of ruling on a motion for permanent custody, whether a child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents, it is to consider all relevant evidence. R.C. 2151.414(E). If it finds, however, by clear and convincing evidence, the existence of one or more of the circumstances enumerated in R.C. 2151.414(E)(1) through (12), then it is required to rule that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. It is important to note, however, that each and every condition of R.C. 2151.414(E) does not have to exist before a court may terminate parental rights. In re Beverly (Mar. 31, 1994), Ross App. No. 93 CA 1992, unreported, 1994 Ohio App. LEXIS 1459, at *11. Rather, the court may make its decision based on the existence of only one of the factors. Id. at *11-12.
At the permanent custody hearing, Sandra Judy, a caseworker for the family since the summer of 1997, testified regarding the family's history with CSB. The family has been involved with CSB on and off since 1993. Prior to the court becoming involved in August 1997, Ms. Reeves was voluntarily involved with CSB and Jan Alberti from Akron Child Guidance because she was having significant problems with the children "acting out."
Additionally, Ms. Judy's first encounter with Ms. Reeves occurred before she was assigned as the caseworker. Ms. Judy was sent to meet with Ms. Reeves in order to assist her in obtaining housing. While there, Kalli vomited on her snowsuit. Because Ms. Reeves made no efforts to clean her up, Ms. Judy ended up cleaning up the child.
When she first became involved with the family, Ms. Judy noted that, during one visit, Kalli was out of control, kicking, screaming, and biting. Ms. Reeves was unable to control Kalli, but Ms. Judy was able to calm her down and there were no further problems during that visit. Ms. Reeves told her that she would often send Jonathan, who was five years old at the time, out to the neighbor's house to get the food that they were storing in their refrigerator. Ms. Judy also stated that Ms. Reeves informed her that Jonathan would often leave the house by himself, and she would have to go out looking for him. On at least one occasion Ms. Reeves had to call the police to find Jonathan and bring him home. Kalli, who was two and a half, had also gotten out of the house by herself. Ms. Judy noted that she was concerned by the lack of any real mutual bonding or attachment between Ms. Reeves and the children. Finally, Ms. Judy noted that the house was clean and in good condition when she first became involved in this case; however, as time progressed the housekeeping deteriorated.
Ms. Judy also had the opportunity to observe Mr. Carmichael in the home during some of the visits. Although Mr. Carmichael would verbally tell the children to stop misbehaving, he would not physically get up to correct their behavior. During one visit, Mr. Carmichael had a verbal altercation with Jonathan in which he essentially told the child that "his mother brought him into the world but he could take him out."
During August 1997, Ms. Judy decided to move for temporary custody of Jonathan. Ms. Reeves had admitted Jonathan to the psychiatric unit at Akron Children's Hospital because he had stabbed Kalli in the foot with a fork. Ms. Reeves was concerned that Jonathan would hurt her or the other children. Ms. Reeves had also previously expressed concern that Kalli was aggressive towards Jordan and Jason: for example, she would hit them, knock them over in their car seats, and take their bottles from them.
On August 27, 1997, CSB filed a complaint for temporary custody of Jonathan, Kalli, Jordan and Jason. The complaint alleged that: 1) Jonathan, age 5, after being admitted to the Psychiatric Unit of Akron Children's Medical Center, had been determined to be a danger to himself and others; 2) Jonathan had run away from home, had set fires in the home, and had threatened to harm his mother and siblings; 3) Ms. Reeves refused to meet Jonathan's needs; 4) Ms. Reeves's home was a hazard to the children's health; 5) Kalli, Jordan and Jason were at risk of neglect by virtue of Ms. Reeves's neglect of Jonathan; 6) Ms. Reeves had neglected to provide timely, consistent medical and psychological treatment, medications and other follow-through with regard to Jonathan; and 7) Akron Child Guidance had provided in-home counseling to both Kalli and Jordan due to Ms. Reeves's failure to bring the children to office appointments. An order of emergency temporary custody was issued on August 27, 1997. On December 5, 1997, the children were adjudicated dependent. The twins were returned to Ms. Reeves with protective supervision and Jonathan and Kalli were placed in the temporary custody of CSB.
This case was reviewed during March 1998. It was determined that the parents had made some, but not substantial progress in their case plans. It was also noted that Ms. Reeves was having difficulty caring for the twins. Accordingly, on April 9, 1998, Jason and Jordan were again placed in the temporary custody of CSB, while Jonathan and Kalli remained in temporary custody.
After CSB was granted temporary custody of the children, CSB filed case plans for Ms. Reeves and Mr. Carmichael. Ms. Reeves's first objective was to get a psychological evaluation and to follow all recommendations. Ms. Reeves did the evaluation, which recommended that she receive counseling. Between August 1997 and February 1999, she was involved with four different counseling agencies and had inconsistently attended counseling sessions.
Ms. Reeves's second case plan objective was to receive parenting classes. Ms. Reeves had attended a few hands-on parenting courses at the visitation center. Also, she sporadically attended classes at Akron Pregnancy Services. Ms. Judy noted that Ms. Reeves had a habit of attending a few courses and then not following through to finish the instruction. Additionally, Ms. Judy stated that she did not see any consistent improvement in Ms. Reeves parenting ability.
Ms. Reeves's third objective was to obtain stable housing. In the two-year time frame that Ms. Judy had been involved, Ms. Reeves had moved between ten and twelve times. CSB had attempted to help her find housing and had paid down payments to assist her. Ms. Judy noted that Ms. Reeves had moved out of two houses leaving all of the furniture and her belongings behind. Ms. Reeves's longest stay in one residence was six months.
The fourth objective was placed on the case plan by the court. The objective required Ms. Reeves to be honest with professionals, based on concerns that she was not being honest with CSB or her therapists. Ms. Judy noted that sometimes Ms. Reeves was honest with her and sometimes she was not. Ms. Reeves's fifth objective was to find a licensed day care provider for the children, based on her history of leaving the children with anyone who was around at the time. Prior to February 1999, CSB had no notice that she had completed that objective. At the hearing, Ms. Reeves presented a document as evidence that she had enrolled the children in a day care program.
During June 1998, Jordan and Jason were returned to Ms. Reeves's custody to determine if she was able to provide care for the children. However, within a short period of time, the condition of the home gradually deteriorated, and the physical appearance of the children also deteriorated. Ms. Judy testified that Ms. Reeves would transport the children in a stroller that was "[v]ery dirty looking. I'm not sure whether it was mold or fungus or exactly what it was. Black stuff on the stroller."
Additionally, Jason and Jordan were very prone to ear infections so their doctor referred had them to an ear, nose and throat specialist. Ms. Reeves was informed that she needed to take the children to the specialist to see if they needed to have tubes put in their ears. Ms. Judy testified that Ms. Reeves failed to follow through with the doctor's appointments; however, Ms. Reeves did take the children to the emergency room for medical treatment twice.
On June 1, 1998, the court terminated temporary custody of Kalli, Jason and Jordan; however, it continued temporary custody of Jonathan. The portion of that order returning the children to Ms. Reeves was stayed on June 4, 1998, when the court became aware that Ms. Reeves had given birth to another child, Terry Carmichael. On June 18, 1998, Jason and Jordan were returned to Ms. Reeves with protective supervision. Jonathan and Kalli remained in the temporary custody of CSB, and CSB was granted emergency temporary custody of Terry.
Ms. Judy was very concerned with the fact that CSB did not learn of Ms. Reeves's pregnancy until she gave birth. Neither Ms. Reeves nor Mr. Carmichael informed anyone involved with this case that Ms. Reeves was pregnant. In fact, Ms. Reeves lied and said that she was not pregnant when questioned by persons involved with the case. CSB became aware of Terry's birth when the hospital called the referral line based on some statements made by Ms. Reeves. Terry had some birth problems and had to remain in the hospital for a few days. Ms. Reeves was given the opportunity to stay with him but she turned down the opportunity.
On August 20, 1998, Jason and Jordan were removed again as a result of two hearings at which both parents testified. Apparently, Ms. Reeves had requested Mr. Carmichael to come over to her house to see the children on several occasions, despite the court's order that his only contact with the children be at the Family Mediation and Visitation Center. The court instructed the guardian to file for removal of the twins.
After the court ordered CSB to remove Jason and Jordan from the home, Ms. Reeves told Ms. Judy to pick the children up at the baby-sitter's home. The person with whom Ms. Reeves had left the children was not a licensed day-care provider approved by CSB. Additionally, Ms. Judy told Ms. Reeves to inform the baby-sitter that Ms. Judy was coming to pick up the children and to send the children's clothing and favorite toys to the baby-sitter so the children could have some of their things; however, Ms. Reeves failed to complete either task. When Ms. Judy arrived at the baby-sitter's home to collect the children, they were dressed in dirty t-shirts and their diapers were saturated to the point that they were dripping.
With regard to visitation, Ms. Judy testified that Ms. Reeves did not consistently visit her children while they were in CSB's care. In fact, Ms. Reeves was taken off of the visitation list in December 1997 and again in September 1998 for missing three visits in a row. Other than those two occasions she would miss some days, but not as many as three in a row.
Ms. Judy was able to observe several visits between Ms. Reeves and her children. Jonathan initiated most contact with Ms. Reeves during the visit. Many times during the visits, Ms. Reeves would be crying and Jonathan would try to comfort her. With Kalli, Ms. Reeves would greet her, Kalli may or may not acknowledge her, then Kalli would go to play with the toys. With Jordan and Jason, Ms. Reeves was much more involved. She would hold the children and try to talk to them. With Terry, she would hold him and try to interact with her four other children.
Ms. Judy was concerned because Ms. Reeves would often cry at the visits and the children would try to be the parent and comfort her. Ms. Reeves had a very difficult time interacting with all five children at the same time especially when Kalli or Jonathan decided to take off in a different direction. Jonathan would take a long time to say goodbye to her; however, the other children did not have a problem leaving her after the visits. Ms. Judy stated that Jonathan has a slight attachment to Ms. Reeves, but the attachment would not hinder an adoption. Ms. Judy additionally stated that none of the other children are bonded to Ms. Reeves in such a way that it would hinder an adoption.
Ms. Judy had no contact with Ms. Reeves between August 1998 to December 1998. During the year and a half of her involvement, numerous services were offered to the family, yet she never noticed a change in Ms. Reeves's behavior toward the children. Ms. Judy testified that she would be very concerned if the children were returned to Ms. Reeves's custody again because Ms. Reeves was unable to care for Jason and Jordan during the short period of time that they were returned to her.
On cross-examination, Ms. Judy noted that Kalli was not present at thirty-one of the scheduled visits because the foster parents would not facilitate the visits. She conceded that the lost time could have impacted Kalli's ability to bond with her mother. She also noted that Ms. Reeves had taken Kalli and Jonathan to United Disability Services for their speech problems for quite some time prior to CSB's involvement.
CSB also developed a case plan for Mr. Carmichael. The first objective was for him to establish paternity of Jason and Jordan. It took him a full year to complete that objective. When Terry was born in May of 1998, CSB added an objective that Mr. Carmichael establish paternity of Terry; however, as of February 1999, he had not completed that objective.
Mr. Carmichael's second objective was to take parenting classes. Ms. Judy was aware that he was involved in some parenting with a case aide from CSB regarding another case involving his daughter, Christina. The third case plan objective was for Mr. Carmichael to contact Decker Family Development Center (Decker) in Barberton, Ohio to determine whether the agency would provide day-care for the children. In the alternative, Mr. Carmichael was to make other appropriate day-care arrangements. Once the arrangements were made, he was to provide CSB with a written proposal for a licensed day-care provider for the children in order for the agency to determine whether the arrangements were appropriate. As of the date of the permanent custody hearing, Mr. Carmichael had not provided a day-care proposal to CSB.
His fourth objective was to obtain a psychological assessment and follow the recommendations. Mr. Carmichael did receive the assessment that stated that he did not appear to need ongoing psychiatric intervention. The assessment indicated that Mr. Carmichael noted that he was going to attend counseling with Mr. Bell.
Ms. Judy had the opportunity to observe visits with Mr. Carmichael and Jordan, Jason, and Terry. According to her testimony, Mr. Carmichael only attended about fifty percent of the scheduled visits. During the visits, Mr. Carmichael would talk to the children and try to keep them in the same area. The children would acknowledge him, but seemed to interact more with each other than with him. Ms. Judy did not believe that there was a bond between Mr. Carmichael and the children.
At the time of the hearing, Mr. Carmichael was self-employed. He would buy flowers from a wholesaler, make simple arrangements and try to sell them in bars and similar places. Ms. Judy testified that she believed that, at a the time of the hearing, Mr. Carmichael was looking for work and receiving Aid to Dependent Children (ADC) for Steven. At one point, he was receiving ADC for Ms. Reeves and her children although CSB had custody of the children.
In addition to his children with Ms. Reeves, Mr. Carmichael also has two other children. He currently has custody of his son, Steven. According to Ms. Judy, Mr. Carmichael and Steven were living in a home with only one bedroom. Ms. Judy has seen Mr. Carmichael interact with his son Steven, which generally involved Steven sitting on his lap while they watched television together. Ms. Judy noted that Mr. Carmichael's home was adequate for his and Steven's needs and his housekeeping skills were good; however, she felt that the home would be inadequate if he was given custody of Jason, Jordan, and Terry.
Ms. Judy testified that she would be concerned if the children were placed in Mr. Carmichael's custody, because she has never seen him physically moving about to ensure the safety of the Jason and Jordan. Additionally, she was concerned because he never got down on the floor to play with the children. Ms. Judy was worried that Mr. Carmichael would not be able to protect the children and that, if the children were returned, Mr. Carmichael would have to take care of four children under the age of five. Ms. Judy felt that the responsibility of caring for all of the children was a lot to ask of someone who had very little child-care experience.
Robert Bell, a psychotherapist with Catholic Social Services, testified that he provided counseling to Ms. Reeves. He met with her fourteen times; however, she missed or did not show up for seven appointments. He stated that Ms. Reeves's goals were to obtain permanent custody of her children, to improve her parenting skills, and to work on dealing with her depression. Although she made really good progress with the depression, he did not see any improvement in her parenting skills.
He testified that Ms. Reeves brought Jordan and Jason to a couple of sessions. The children and the stroller were very dirty. During the session, Jordan and Jason were very hyper, and Ms. Reeves spent a lot of time trying to calm them down. Although she used some good parenting skills to try to calm them down, the children would only be calm for a few minutes. Ms. Reeves was able to set appropriate limits for the children, but she had a hard time enforcing them. She really appeared to be trying to set appropriate limits and take care of the children's physical needs; however, she seemed incapable of doing so. In the two times he saw them together, he determined that emotional involvement, nurturing, and bonding were missing.
Mr. Bell diagnosed Ms. Reeves with adjustment disorder involving anxiety and depression and with a history of post-traumatic stress disorder. During the course of treatment she reported that she was having severe debilitating migraines. Overall, Mr. Bell felt that, on many occasions, Ms. Reeves wasn't being honest with him about her relationship with Mr. Carmichael and her employment opportunities. In fact, he described Ms. Reeves as a pathological liar. Although she was pregnant while she was in counseling, she never told him that she was pregnant. Eventually, he closed the case because she stopped attending. Although he had not seen her for five months prior to the hearing, he would have concerns for the children's safety and emotional well being if they would be returned to her permanent custody.
Mr. Bell also counseled Mr. Carmichael based on a CSB referral. He met with Mr. Carmichael four times between December 1997 and March 1998. Four additional appointments had been set up; however, Mr. Carmichael canceled three of them and did not show up for one. Mr. Carmichael stated that his goals were to cope with the stress of CSB having custody of his children, to cope with the stress of dealing with Ms. Reeves and to learn to handle his depression. According to Mr. Bell, Mr. Carmichael did not make much progress on managing his stress, but he did make progress on dealing with his depression.
Mr. Bell stated that he never knew whether or not to trust Mr. Carmichael. Mr. Carmichael repeatedly told him that he wanted to terminate his relationship with Ms. Reeves and get her out of his house, but he never really did anything about it. Additionally, Mr. Carmichael did not tell him that Ms. Reeves was pregnant. In his opinion, Mr. Carmichael did not appear motivated to get treatment or counseling.
Mr. Bell noted that he would be concerned for the children's safety if they were to be left in Mr. Carmichael's care. Although he never saw Mr. Carmichael with any of his children, he was concerned that Mr. Carmichael would not be a proper role model and could not provide proper nurturing. Mr. Bell felt that Mr. Carmichael did not have very good parenting skills and was not careful about choosing caretakers for the children. However, he admitted that he did not have any knowledge of who Mr. Carmichael left his children with or whether they were left with someone who would not take care of them.
Susan Fox-Worth, a professional clinical counselor with Family Services of Summit County, testified regarding her sessions with Ms. Reeves. She began treating Ms. Reeves in August of 1998. Ms. Reeves told her that she discontinued counseling with Mr. Bell because she had difficulty trusting him. Ms. Reeves did not feel that it was safe to talk to him because she had given him information that had made its way back to Mr. Carmichael. Ms. Reeves told her that she did not trust Ms. Judy or Mr. Bell.
Ms. Fox-Worth diagnosed Ms. Reeves with adjustment disorder. She later revised the diagnosis to include major depressive disorder. The primary goal was to get CSB out of Ms. Reeves's life by doing whatever they asked her to do. Ms. Reeves missed several appointments and stated that she missed the appointments due to migraines that disabled her to the point of not being able to function. It took Ms. Fox-Worth two months to convince Ms. Reeves to take medication for her headaches and her depression.
Throughout the course of the counseling sessions, Ms. Fox-Worth tried to work with Ms. Reeves on discipline. She has seen Ms. Reeves interact with Alicia, her oldest child, and described the interaction as positive. She believes that Ms. Reeves has nurturing ability; however, she has based that opinion mostly on the concern that Ms. Reeves has expressed for the children and stories that she had relayed to her.
Ms. Fox-Worth testified that she has no concerns that Ms. Reeves would harm her children if she had them in an unsupervised setting. While Ms. Reeves is on her medication, she is pleasant and cheerful and has a lot of energy to deal with her children. If Ms. Reeves would get the children back, Ms. Fox-Worth would like for her to continue receiving therapy. On the other hand, she would be concerned if Ms. Reeves was given custody of the children and went off the medication.
Ms. Fox-Worth noted that Ms. Reeves has an addiction to relationships, which means that she focuses on the male in her life instead of on her children. She testified that Ms. Reeves was currently in recovery and not in a relationship. She testified that Ms. Reeves informed her that she had completed parenting classes, enrolled in classes to get her GED and had established possible housing for her and her children. However, Ms. Reeves had not, in fact, done any of them. Additionally, Ms. Reeves informed her that Mr. Carmichael would verbally abuse her, that he once pushed her and grabbed her, that he sold marijuana. Ms. Reeves denied making the statements about the physical abuse and the marijuana.
Jan Alberti, a licensed clinical counselor employed by Akron Child Guidance, testified that Akron Child Guidance actually began seeing Jonathan in July of 1996 based on his behavior problems. At that time, Jonathan was out of control, he was very aggressive, and Ms. Reeves was having trouble managing him. Ms. Reeves only took him to the center for therapy twice between July and December 1996; however, she had missed several scheduled appointments during that time. As a result, Ms. Alberti began in-home visits with the children.
Ms. Alberti noted that Jonathan was very angry and assaultive. He pulled her hair, tried to bite and kick, threw things, would tip over furniture and would assault Kalli and Ms. Reeves. Ms. Reeves told her that she was unable to control him, and at times, he would run out of the home. Ms. Alberti noted that Ms. Reeves would reprimand Jonathan verbally in a negative way; however, she would not get up and try to stop the behavior. Ms. Alberti tried to assist Ms. Reeves by showing her how to redirect Jonathan's behavior, but Ms. Reeves did not seem to be capable of completing and following through with giving Jonathan direction. When she observed Kalli in the home, she was also aggressive, assaultive, demanding, oppositional, and out of control. Ms. Reeves also demonstrated poor follow through with trying to redirect Kalli's behaviors.
Prior to the children's placement in the temporary custody of CSB, Jonathan was diagnosed as having Attention Deficit hyperactive Disorder (ADHD). He was placed on Ritalin for a short time; however, Ms. Reeves ran out and did not get the prescription renewed. Ms. Alberti told Ms. Reeves that if she felt she could no longer handle Jonathan, she could take him to Children's Hospital Psychiatric unit. Ms. Reeves did so during August 1997.
Ms. Alberti also noted that she had visited several of Ms. Reeves's residences. Ms. Alberti described one home as being very dirty and very cluttered. She stated that there was furniture lying around that Jonathan had broken. With regards to another of Ms. Reeves's residences, Ms. Alberti noted that, when the family moved in the home, it was very nice; however, over time the condition of the home deteriorated. The carpet was soaked with urine, the walls had been damaged, and both toilets were clogged. Additionally, the kitchen floor was covered with food, and there were bowls and dishes on the floor with food in them. The children's bedrooms were filled with piles of soiled clothes.
Barbara Roth, a family preservation worker with CSB, testified regarding her involvement in this case. She was sent into the home to assess the family to determine if the family was appropriate for the family preservation program. She had four visits in the home during which she would take Jason and Jordan to visit Mr. Carmichael and Ms. Reeves. Additionally, she observed six or seven visits at the visitation center. She testified that during the visits Mr. Carmichael would play with the children; however, when one of the children would cry or need his diaper changed, he would give the child to Ms. Reeves. Ms. Roth noted that Mr. Carmichael had very little positive interaction with the children, he would merely sit in the chair with them and watch television. Ms. Reeves would become defensive when Ms. Roth gave suggestions as to basic parenting skills.
Both parents were told to have supplies such as diapers in the home for the visits, yet they did not, until the last visit, actually have the supplies in the home. Ms. Roth testified that Mr. Carmichael and Ms. Reeves were dishonest about canceling a visit. They told her that they had to cancel the visit to work; however, they had instead gone to the hospital to pick up Christina, Mr. Carmichael's newborn baby from another relationship. During the three months that she was involved with the family, she saw neither improvement in either parent's parenting abilities nor did she see a desire to make the changes.
Rubye Boone, a social service aide with CSB, testified regarding her knowledge of the family. She was in charge of closely supervising family visits at the visitation center. She testified that between September 1997 and August 1998, Ms. Reeves was scheduled to have between forty and forty-two visits with her children. Ms. Reeves only attended twenty-five of those visits. Mr. Carmichael attended about five or six of those visits.
During the visits Jordan would cry almost all the time. Ms. Reeves was not usually able to comfort him. The staff at the visitation center would take turns trying to comfort him and sometimes the foster mother would be there to comfort him. Jordan would usually stop crying immediately once in the care of the foster mother. Ms. Reeves would often cry during the visits and upset the children. Ms. Reeves did not have many interactions with Kalli during the visits.
According to Ms. Roth, Ms. Reeves did not visit the children at all between December 18, 1997 and April 10, 1998. Between April 1998 and August 1998, Ms. Roth described the visits as chaotic. For a while, two aides had to be scheduled to supervise the visit for the safety of the children. When Ms. Reeves had custody of Jason and Jordan between June and August of 1998, Ms. Roth testified that she brought them with her to the visits and both children were very dirty. Their stroller was caked with some sort of mold and was "beyond dirty." Ms. Roth testified that Ms. Reeves tried to adequately supervise the children, but she was simply unable to accomplish that task. She saw no improvement in Ms. Reeves's parenting skill during her time involved in the case.
At one visit that Mr. Carmichael attended with Ms. Reeves, he was able to comfort the twins when Ms. Reeves was unable to do so. He managed to put both of the children to sleep on that occasion. Mr. Carmichael was having separate visits with the children even after Ms. Reeves was taken off of the visitation schedule.
Ms. Reeves testified at the hearing on her own behalf. She stated that she sought out the help of CSB because she was concerned about Jonathan's aggressive behavior. When she admitted him to the hospital, she was merely following the advice of Ms. Alberti. She was under the belief that CSB was only concerned with Jonathan; therefore, she was upset when her other children were taken away from her. As a result, she is no longer able to trust anyone at CSB. She did not inform anyone at CSB that she was pregnant because she was afraid that they would take the baby away from her. According to her testimony, none of the CSB workers directly asked her if she was pregnant.
Regarding the day Kalli vomited on herself, Ms. Reeves testified that she did try to clean Kalli up, but Ms. Judy said that she would do it because Jordan was crying and needed assistance. According to Ms. Reeves, the condition of the home deteriorated because she had had surgery and was unable to lift anything over five pounds. With respect to the visits at the visitation center, Ms. Reeves stated that they went well and were not chaotic. She said that at one visit Jonathan got angry because he could not go home with her, so he ran out of the room and sat in a chair right outside the door. She went after him and tried to calm him while he was crying. She also testified that she had no problem caring for Jordan and Jason when they were returned to her.
Because she did not visit her children between December 1997 and April 1998, she was taken off of CSB's visitation schedule. She had to call Ms. Judy to be placed back on the visitation schedule. She was informed at that time that she would be taken off of the schedule again if she missed three visits in a row.
Ms. Reeves stated that she canceled one of her visits with the children on the advice of Ms. Judy because CSB had just taken Jordan and Jason back into custody and Ms. Judy thought that Ms. Reeves would upset the other children during the visit. She stated that she missed a lot of other visits due to severe migraines. Her migraines were often so severe that she would temporarily lose her vision. Finally, she testified that she was wrongfully taken off the visitation schedule during August 1998, and she had been trying to be put on the schedule ever since.
With respect to the parenting classes, Ms. Reeves testified that she had been working on her parenting abilities with Ms. Fox-Worth and her daughter Alicia. Also, she was attending parenting classes at Akron Pregnancy Services. To successfully complete the course, Ms. Reeves was required to attend thirteen weeks of classes. In the nearly two and one half years after being ordered to attend parenting classes, Ms. Reeves had not attended thirteen sessions. She had with her a certificate that she still had three classes to complete, which she planned to complete within three weeks of the date of the hearing.
As of March 22, 1999, Ms. Reeves had an application pending for AMHA housing that was dependent on whether her children were returned to her. At that time, she also presented a letter that she had enrolled the children in daycare with the Salvation Army. It took her over one year to complete those portion of the case plan.
Mr. Carmichael presented the testimony of Mark Correia, a CSB caseworker. Mr. Correia was assigned to Mr. Carmichael's other case involving his son Steven, his daughter Christina and Judy Streharsky, the children's mother. Steven has remained in Mr. Carmichael's custody during the case at bar. Christina was recently placed in the legal custody of Mr. Carmichael's mother. As a part of Mr. Carmichael's case plan with respect to Steven and Christina, he was required to attend parenting classes. He did not receive the required instruction until the services were provided in Ms. Streharsky's home.
As another portion of that case plan, Mr. Carmichael was required to have Steven assessed with United Disability Services and follow through with getting him placed into the structured environment. After the assessment, it took Mr. Carmichael four months to get Steven registered in the program. The magistrate had to stress upon him that she wanted him to accomplish the goal or risk losing his children and Mr. Correia had to help Mr. Carmichael accomplish the goal before the goal was actually accomplished.
Mr. Correia also had concerns about Mr. Carmichael leaving Steven with inappropriate caretakers. Pursuant to a court order, Ms. Streharsky was not to have unsupervised contact with Steven. Mr. Carmichael disregarded that court order and allowed Steven to stay with her and was later held in contempt of court.
Mr. Carmichael then presented the testimony of Beverly Danzy, a CSB family services worker. Ms. Danzy was assigned to provide homemaker services to Mr. Carmichael and Ms. Streharsky in Ms. Streharsky's home. She provided parenting instruction on a weekly basis. She testified that Mr. Carmichael was making good progress on some of the issues that she had raised. At one point, however, Ms. Streharsky started canceling the appointments. After having no instruction for three months, Mr. Carmichael telephoned Ms. Danzy to determine why the parenting instruction had ceased. Mr. Carmichael informed her that he was not aware that Ms. Streharsky had cancelled the appointments.
Victoria Diamond, a visitation aide with CSB, also testified on behalf of Mr. Carmichael. She began supervising his visits with Jordan, Jason and Terry on September 1, 1998. She was able to observe more than twelve visits. At first, either Jason or Jordan would cry severely. In response, Mr. Carmichael would remain calm and try to comfort the crying child. After a few visits, the children settled down. Mr. Carmichael did a good job of keeping the children in the visitation area and demonstrated fair and nurturing parenting skills. According to Ms. Diamond, Mr. Carmichael did not play with the children much. However, at her last visit, he did get down on the floor to play with the children after she had left the room. Mr. Carmichael only attended approximately fifty percent of the scheduled visits. In fact, at one point, he should have been taken off of the visitation list for missing three visits in a row; however, due to an oversight, he was never removed from the list.
Finally, Mr. Carmichael testified at the hearing. Mr. Carmichael testified that it took him a long time to establish paternity as to Jason and Jordan because no one would help him. He stated that he would call Ms. Judy and she would not call him back until three or four weeks later. As for establishing paternity of Terry, he has been unable to meet that objective because the agency responsible for the testing informed him that he needed a court order to have the testing done.
As for the parenting courses, Mr. Carmichael testified that he was receiving parenting instruction from Ms. Danzy through his other CSB case. With respect to the proposed day-care plan, Mr. Carmichael stated that he contacted Decker in an attempt to make day-care arrangements; however, they repeatedly denied his requests because neither he nor Ms. Reeves lived in Barberton. When Ms. Reeves informed him about the day care program at the Salvation Army, he told her to go ahead and sign them up. In the event that the children are returned to him, he would utilize that day care service.
Mr. Carmichael testified that he lives in a two-bedroom apartment with Steven. He stated at the time of the hearing that Steven was with a baby-sitter who lived in his apartment building. He testified that he was enrolled in truck-driving classes in the hopes of being able to support his children. Additionally, he testified that he had a friend who was willing to help him with his flower business so that he would not have to be out selling in bars late at night. He testified that no one from CSB had been to his house within the last year and a half. Finally, he testified he had made arrangements with his landlord to move into a larger apartment if the court granted him custody of the children.
The court also heard testimony that the children have improved since they have been out of Ms. Reeves's care. When Jonathan was admitted into foster care, he was put back on Ritalin and was having some positive improvements. Recently, Jonathan started receiving Clonidine in addition to the Ritalin. Once in the foster home, Jonathan's behavior changed dramatically. He now has more self-control, and his emotional outbursts are almost non-existent. He is no longer aggressive, and he is active and plays with the other children in the home without fighting. He has not run away nor been aggressive toward other children since he has been in the foster home.
Although Jonathan was five years old, his speech was that of a two or three year old when he was removed from his mother's care. He would get very frustrated with his inability to communicate and would throw a temper tantrum or hit others when he was unable to communicate his needs. Jonathan has received counseling and speech therapy during the year and a half that he has been in foster care. He is now much more articulate, seems calmer, and does not become frustrated as easily. He seems more responsive to directions from adults. He has, however, had some self-abusive episodes that occurred after visits with his mother including one episode during which he punched himself in the eye.
Prior to being taken into custody, Kalli would fly into rages and was aggressive toward her younger siblings. She was destructive with objects and would tear up things like clothing. Since being taken into custody, Kalli's behaviors are improving. Initially, it appeared as if Kalli also had ADHD, and she had developmental and language delays. She began receiving counseling once her speech reached the point where she was able to communicate. Kalli now responds well to adult direction and is not as aggressive as she used to be. She has been aggressive to another child on two or three occasions at school because she gets frustrated and takes her aggression out on other children. Overall, her anger and frustration have been decreasing.
The twins, Jordan and Jason, are not having any behavioral problems; however, their speech is somewhat delayed. They are in the same foster home as Terry. Terry has been in CSB's custody essentially since his birth. He had some health problems at birth, and it was uncertain at the time of the hearing whether he would have further medical problems.
Ms. Reeves and Mr. Carmichael have essentially argued that they substantially completed their case plans; therefore, the judgment of the trial court terminating their parental rights was against the manifest weight of the evidence. Ms. Reeves and Mr. Carmichael waited essentially until the eve of trial to attempt to complete the majority of their case plan objectives. Further, they each have a history of sporadic visitation with the children and disregard for court orders regarding the safety of the children. Ms. Reeves and Mr. Carmichael's last minute attempts at compliance with the case plan, although commendable, are insignificant in light of their history in this case. See In reGray (Dec. 22, 1999), Wayne App. Nos. 99CA0014 and 99CA0015, unreported at *6.
"[B]efore an appellate court will reverse a judgment as against the manifest weight of the evidence in a civil context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice." In re Evens (Feb. 2, 2000), Summit App. No. 19489, unreported, at 6-7. After reviewing the record, this Court cannot conclude that the juvenile court clearly lost its way and created a manifest miscarriage of justice. Accordingly, Mr. Carmichael's first through fifth and Ms. Reeves's fifth assignments of error are overruled.
 B. Ms. Reeves's First Assignment of Error The Trial Court erred and abused it's (sic) discretion when it continued to deny [Ms. Reeves'] right for visitation with her children, in violation of her due process rights, and the prior Court dated October 9, 1998.
 In her first assignment of error, Ms. Reeves has essentially asserted that, by erroneously terminating her visitation with her children, the juvenile court precluded her from complying with her case plan. Specifically, she has asserted that the denial of her right to visitation: 1) precluded her from demonstrating adequate parenting skills as required by the case plan, and 2) precluded her from demonstrating her commitment to the children through regular visitation. Therefore, she has asserted that the juvenile court effectively prevented her from complying with the case plan only to use that non-compliance against her to terminate her parental rights. This Court disagrees.
Ms. Reeves was taken off of CSB's visitation schedule twice for missing visits. After being taken off of the list the second time, Ms. Reeves moved the juvenile court to hold CSB in contempt for failing to provide her visitation with her children. On October 9, 1998, the juvenile court issued an order that stated in pertinent part:
 The mother's counselor shall submit a report to Childrens [sic] Services Board regarding the viability of visitation being resumed between the mother and the children. The report shall contain recommendations regarding the mother's parenting ability, given her mental health status and any other relevant factors. * * * If the mother/child visitation is recommended by the mother's counselor, the mother is ordered to appear at the visitation center at least one half hour prior to the visitation time, or the visit shall be forfeited.
 Subsequently, Ms. Fox-Worth submitted three letters to the court, none of which made specific recommendations regarding the viability of visitation being resumed. Thereafter, Ms. Reeves moved the court for visitation on two separate occasions; however, both times her request was denied.
A reviewing court will not reverse the judgment of a juvenile court absent an abuse of discretion. In re Pieper Children
(1993), 85 Ohio App.3d 318, 330. To constitute an abuse of discretion, a trial court's action must have been arbitrary, unreasonable, or unconscionable. State ex rel. The V Cos. v.Marshall (1998), 81 Ohio St.3d 467, 469. Based on Ms. Reeves's history of missed visits, either for illness or otherwise, this Court cannot conclude that the juvenile court abused its discretion when it denied her motions for visitation.
Even assuming, for the sake of argument, that the juvenile court did incorrectly deny her of her right to visitation, Ms. Reeves has failed to show that she was prejudiced by that error. Despite Ms. Reeves's contentions, the juvenile court did not base its decision to terminate Ms. Reeves's parental rights on her failure to visit from August 1998 to February 1999. In its journal entry, the juvenile court did not even mention Ms. Reeves's lack of visitation with her children during the last few months prior to the hearing. The juvenile court based its determination to terminate Ms. Reeves's parental rights based on Ms. Reeves's history in this case and her failure to complete the case plan prior to CSB's decision to move for permanent custody. Accordingly, Ms. Reeves's second assignment of error is overruled.
 C. Ms. Reeves' Second Assignment of Error The Trial Court erred as a matter of law and abused it's (sic) descretion (sic) when it violated [Ms. Reeves'] due process rights when it granted [CSB's] motion to quash the family records, permitted [CSB's]'s witness to testify (sic) about family records and when it relied upon the family records to grant permanent custody of Jonathan, Jason, Jordon, and Terry.
 In her second assignment of error, Ms. Reeves has asserted that the trial court abused its discretion when it granted CSB's motion to quash the family records. Specifically, she has asserted that, because she was not provided with those records, she was unable to effectively cross-examine the witnesses and/or call rebuttal witnesses. This Court disagrees.
On January 14, 1999, Ms. Reeves filed a praecipe for a subpoena duces tecum to Ms. Judy requesting the "[e]ntire family record, including computer records, files, logs, notes, schedules for visitation between 8-97 to present." CSB moved the court to quash the subpoena to the extent that it requested records that were confidential. Prior to the hearing in this matter, the juvenile court held a conference in chambers with all the parties to hear discussions regarding the motion to quash. The juvenile court granted the motion with two exceptions: (1) Ms. Diamond would be available as a witness at the permanent custody hearing, and (2) the visitation records in the possession of Ms. Boone would be available for counsel to question the witnesses at the hearing.
Ms. Reeves has asserted that testimony elicited from Ms. Judy regarding the family's history with CSB denied her the right to a fair trial because she was not given access to these documents prior to trial. Additionally, she has asserted that her due process rights were violated when she was not given access to all of the documents from which the case history was based. This Court disagrees.
When seeking permanent custody of a child, a children services board must permit the child's parents reasonable access to the files of the agency in order to obtain information relevant to the issues before the court. Davis v. Trumbull City. ChildrenServ. Bd. (1985), 24 Ohio App.3d 180, 184. The juvenile court determined in this matter that Ms. Reeves should be given access to the visitation records of Ms. Diamond and Ms. Boone. Ms. Reeves has failed to demonstrate that the materials sought would have been anything but cumulative in light of other evidence submitted. Furthermore, Ms. Reeves was given access to the CSB case summary on February 8, 1999 and was able to cross-examine Ms. Judy regarding its contents on February 9, 1999. This Court concludes that Ms. Reeves was given reasonable access to information relevant to issues before the juvenile court. As such, the juvenile court did not abuse its discretion when it granted portions of CSB's motion to quash. Accordingly, Ms. Reeves's second assignment of error is overruled.
 D. Ms. Reeves's Third Assignment of Error The Trial Court erred as a matter of law when it denied [Ms. Reeves'] motion for a new trial, in accordance with Civ.R. 59(A)(1) and (2), based on [sic] apparent misconduct by the [guardian ad litem], CSB and [CSB's] witness, Jan Alberti.
 In her third assignment of error, Ms. Reeves has basically asserted that the trial court erred when it denied her motion for a new trial based on the misconduct of the guardian ad litem. Specifically, Ms. Reeves has asserted that she was entitled to a new trial because the guardian ad litem had a discussion with a witness during a recess regarding an objection by Mrs. Reeves to the witness's testimony. Ms. Reeves has asserted that the guardian ad litem told the witness how to phrase her answers to avoid exclusion of the testimony as hearsay. As such, she has argued that the guardian ad litem committed misconduct necessitating the trial court to grant her request for a new trial. This Court disagrees
Civ.R. 59(A) sets forth the grounds for which a trial court may grant a new trial. Ms. Reeves has asserted that she was entitled to a new trial for the following two reasons set forth in Civ.R. 59(A):
 (1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
(2) Misconduct of the jury or prevailing party[.]
 Because the decision of directing a new trial rests within the sound discretion of the trial court, a reviewing court may reverse a denial of a new trial only if the trial court abused its discretion. Yungwirth v. McAvoy (1972), 32 Ohio St.2d 285, 286.
During the hearing in this matter, CSB called Janet Alberti, a licensed professional clinical counselor with Akron Child Guidance, to testify regarding her involvement with the parities in this case. At one point in the hearing, CSB asked a question to which Ms. Reeves' attorney objected on the grounds that the answer would elicit hearsay. Specifically, the answer required the witness to testify to statements made to her by Jonathan's foster mother. The juvenile court sustained the objection.
CSB then questioned the witness regarding statements made to her by Jonathan. Ms. Reeve's attorney again objected. CSB asserted that statements made by a child to a therapist fit under an exception to the hearsay rule. The juvenile court then took a recess to analyze the hearsay rule. When the court reconvened, Ms. Reeves' attorney informed the court that, during the recess, the guardian ad litem advised the witness as to what rulings the court was going to make and told her to change some testimony around. Ms. Reeves' attorney then asked the court to strike her testimony and prevent her from testifying further.
The court asked the guardian ad litem if the allegations were correct. She informed the court that she explained to the witness that the testimony was stopped because of a hearsay problem; however, she did not, as alleged, instruct the witness to change her testimony. The court overruled the objection and allowed the witness to testify further. After the juvenile court granted permanent custody to CSB, Ms. Reeves moved for a new trial asserting that she was prejudiced by the misconduct of the witness and the guardian ad litem. In support of her motion, she submitted affidavits from Mr. Carmichael and herself averring that they heard the guardian ad litem tell the witness that, in order to get past the hearsay objections, she had to rephrase her testimony to reflect that Jonathan made the statements not the foster mother.
After reviewing the record, this Court cannot conclude that the juvenile court abused its discretion when it denied Ms. Reeves' motion for a new trial. The juvenile court had the opportunity to observe the demeanor of all of the parties involved at the time the allegations were made and determined that the witness and the guardian ad litem did not engage in any inappropriate behavior. The trier of fact is in the best position to judge the credibility of witnesses; therefore, appellate courts will not substitute their judgment on factual issues. James v.James (1995), 101 Ohio App.3d 668, 689. This Court cannot conclude that the trial court's denial of Ms. Reeves's motion was unreasonable, arbitrary or unconscionable. As such, the trial court did not abuse its discretion. Accordingly, Ms. Reeves's third assignment of error is overruled.
 E. Ms. Reeves's Fourth Assignment of Error The Trial Court committed prejudicial error in permitting the hearsay statements of a minor child as to [sic] alleged physical abuse.
 Mr. Carmichael's Sixth Assignment of Error The Trial committed [sic] prejudicial error in permitting the hearsay statements of a minor child as to alleged physical violence.
 Ms. Reeves and Mr. Carmichael have asserted that the juvenile court erred when it allowed Ms. Alberti to testify regarding an alleged statement made to her by Jonathan. They have asserted that the statement failed to meet the requirements for an admission pursuant to Evid.R. 807; therefore, the statement should have been excluded.
During the hearing in this matter, CSB questioned Ms. Alberti regarding her knowledge of incidents of self-abuse by Jonathan. Mr. Carmichael's attorney objected asserting that the answer called for inadmissible hearsay because the witness would have to testify to statements made to her by Jonathan. The juvenile court overruled his objection and allowed the testimony. Ms. Reeves and Mr. Carmichael have asserted that, because the answer raised issues dealing with child abuse, Evid.R. 807 applied. He has asserted that the statements were inadmissible because CSB failed to comply with the requirements of that rule.
CSB has asserted that, pursuant to Juv.R. 34(B)(2), the rules of evidence did not apply at the permanent custody hearing. CSB, therefore, has contended that the juvenile court has discretion to admit hearsay testimony into evidence. CSB, however, has repeatedly failed to recognize the entire content of Juv.R. 34(B)(2). See, e.g., In re Swisher (Apr. 23, 1997), Summit App. No. 17952, unreported, at *10. Juv.R. 34(B)(2) provides:
 Except as provided in division (I) of this rule, the court may admit evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence.
 (Emphasis added.) Juv.R. 34(I) specifically states that in a hearing on a motion for permanent custody the rules of evidence shall apply. In the instant appeal, the purpose of the hearing was to determine whether to grant CSB's motion for permanent custody. Because the rules of evidence did apply in the hearing below, CSB's assertion is without merit.
In abuse cases, a trial court should use Evid.R. 807 to determine whether to admit an out-of-court statement made by a child who, at the time of the trial or the hearing, was under the age of twelve. In re Coy (1993), 67 Ohio St.3d 215, at paragraph two of the syllabus. Pursuant to Evid.R 807(A), such statements are not excluded as hearsay under Evid.R. 802 if all of the following apply:
 (1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid. R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. * * *
 (2) The child's testimony is not reasonably obtainable by the proponent of the statement.
 (3) There is independent proof of the sexual act or act of physical violence.
 (4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.
 Evid.R. 807(C) requires the court to make the findings mandated by the rule on the basis of a hearing and requires the court to make findings of fact on the record as to the basis for its ruling.
There is no showing in the record that the juvenile court considered the factors set forth in the statute before admitting the hearsay statements at issue. As such, this Court concludes that the juvenile court erred in admitting the hearsay statements; however, this Court also concludes that the error in the admission of the statements was harmless. The erroneous admission of hearsay evidence is harmless if additional information, separate and apart from the erroneously admitted evidence, has been offered to prove that which the challenged evidence was offered to prove.In re Hubbard (Oct. 7, 1991), Butler App. Nos. CA-90-05-081, CA-90-05-082, CA-90-05-083, 1991 Ohio App. LEXIS 4795, at *10.
Although the juvenile court clearly relied on the erroneously admitted hearsay, those hearsay statements were not the sole reason for granting the motion for permanent custody. A review of the record reveals that CSB presented separate and additional evidence sufficient to prove by clear and convincing evidence that the children could not be placed with either parents within a reasonable time or should not be placed with either parent, and that the grant of permanent custody to CSB was in the best interests of the children. Because Ms. Reeves and Mr. Carmichael were not prejudiced by the erroneous admission of the hearsay, the juvenile court's erroneous admission was harmless error. As a result, Ms. Reeves's fourth assignment of error and Mr. Carmichael's sixth Assignment of error are overruled.
 III.
Ms. Reeves and Mr. Carmichael's assignments of error are overruled. The judgment of the juvenile court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ BETH WHITMORE
BAIRD, P.J., SLABY, J., CONCUR.
[1] The parties' assignments of error have been rearranged for ease of discussion.